IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Fortis Corporate Insurance SA,                          Case No. 3:04 CV 7048

                              Plaintiff,                MEMORANDUM OPINION
                                                        AND ORDER

            -vs-
                                                        JUDGE JACK ZOUHARY
M/V Inviken, et al.,

                              Defendants.


## INTRODUCTION

Plaintiff, Fortis Corporate Insurance SA (Fortis), brought claims against Defendant, Viken

Ship Management AS (VSM), following damage to cargo carried aboard the M/V Inviken (Inviken)

on a voyage from Szczecin, Poland to Toledo, Ohio in October 2002.  Federal maritime law applies,

giving this Court exclusive jurisdiction over the claims.  This Order, which includes the Court's

findings of facts and conclusions of law, follows a two-day bench trial.

Plaintiff seeks damages for negligence and breach of bailment.  The parties agree that seawater

entering the No. 2 hold damaged the cargo of steel coils and further stipulate the damages are

$375,000.  The central issue for the Court is whether VSM owed Fortis a duty to safely transport the

cargo and whether VSM breached that duty by failing to timely react to rising water in the No. 2 hold.

In determining whether a breach occurred, the key inquiry is:  when did the source of the leak, a crack

in the hull, occur, and when should the crew have noticed that water was entering the No. 2 hold.

**STIPULATED FINDINGS OF FACT**

Fortis is the subrogated underwriter who insured the damaged hot-rolled steel coils owned by Metallia USA (Metallia) and carried aboard the Inviken from Szczecin, Poland to Toledo, Ohio in October 2002.  The Inviken is a Bahamas-flag, handy-sized bulk carrier, 17,313 gross ton, built in 1984, classed by the American Bureau of Shipping, and owned by Viken Lakers AS.  VSM is a Norwegian company engaged in the business of managing vessels and providing crews, including for the Inviken.

Immediately prior to the voyage at issue, the Inviken sailed from Richards Bay and Saldanha Bay to Antwerp with a load of lead concentrates and chrome ore.  The vessel arrived in Antwerp on October 4.  On October 5, she moved alongside Berth 215, discharged part of her cargo, and received fuel from two barges.  On October 6, she moved to a different port side berth, discharged additional cargo onto the quay and into barges.  While in Antwerp, the vessel's holds were cleaned and the hold bilges were pumped out.[1]  The Inviken departed Antwerp for Szczecin on October 10.

Once in Szczecin, the vessel berthed starboard side along Berth 48 and prepared for loading of both hot- and cold-rolled steel coils.  On October 15, the loading and securing of steel coils in the No. 2 hold were completed at about 0600 hours.  The Inviken departed Szczecin on October 17 at 0900 hours.

After departure, the crew performed bilge soundings, a method of checking the amount of water in the ship's bilges.  These daily soundings for the No. 2 hold were documented in the ship's log as follows:

---

[1] A hold on a vessel is a compartment below deck used for carrying cargo.  The bilge is an enclosed area between the frames into which water may seep and accumulate.

M/V Inviken - Bilge Soundings in Meters

| DATE | 2P/2S |
|------|-------|
| October 17 | MT [empty] |
| October 18 | .12/.35 |
| October 19 | .29/.35 |
| October 20 | .56/.54 |
| October 21 | .57/.53 |

The log further shows that a visual inspection of the No. 2 hold did not occur until October 19 with this notation:

> Entered and visual inspection of cargo hold w/ steel coils cargo in Hatch No. 1 [thru] 7.  Found out lots of humidity in Hold No. 2 and cargo condition were in the same at [departure] loading port condition, still in good stowed.

The next day, October 20, the log shows the bilges for the No. 2 hold were pumped to empty. Curiously, the log also notes all the cargo remained in the same "good" condition -- almost verbatim as the day before:

> Carried out thorough inspection of cargo hold w/ steel coils cargo in Hatch No. 1 [thru] 7.  Found cargo condition were the same at departure loading port condition, still in good stowed.

On the morning of October 21, after an inspection of the No. 2 hold, the Chief Mate reported to the Master there was water entering the hold on the starboard side.  The Master then inspected the hold and observed a crack in the hull plate on the starboard side which was leaking water into the No. 2 hold; the water was entering at a constant rate but "definitely not shooting."  The crew created a temporary repair using rubber and steel supports.

After arriving in Toledo on October 30, the cargo was discharged.  Upon inspection, it was recorded that ninety-nine coils of hot-rolled steel owned by Metallia suffered damage as a result of

3

contact with the seawater. Fortis, as underwriter, paid Metallia $375,000, an amount both parties agree represents the damages in this lawsuit.

### PLAINTIFF'S EXPERT - CAPTAIN JACK ISBESTER

Captain Isbester is a licensed Extra Master, the highest level of merchant shipping captain, with more than thirty-five years of experience at sea. He began his career as a junior officer and finished his sailing career as a ship master of dry bulk carriers traveling throughout the Atlantic Ocean and Mediterranean Sea. Following his time at sea, Captain Isbester worked as a surveyor and senior manager for CWA Consultants. In 1993, he authored "Bulk Carrier Practice," a book on the operation of dry bulk carriers published by the Nautical Institute, and has also published other papers relating to bulk carrier practice. He is now a consultant for Eagle Lyyon Pope Global Maritime Group.

Captain Isbester opined the crack on the starboard hull occurred prior to October 18, most likely during the offloading of cargo in Antwerp from October 6 to October 10 when barges were brought along the ship's starboard side to offload cargo. Tugs fueling these barges could have collided with the ship with enough force to crack the hull. During the offloading in Antwerp and the subsequent voyage to Szczecin, because of the empty holds and low draft, the height of the crack would have been above the water line. Without water entering the hold, the crack would not have been noticed.

Upon arriving in Szczecin, the No. 2 hold was loaded first and closed on October 15. After the hold was closed, the only way for the crew to detect water entering the hold was by bilge soundings. As the crew continued to load the ship, the crack eventually dropped below the water line, and water started entering the No. 2 hold.

4

While in port, the log book shows bilge readings (October 15-17) as empty.  Captain Isbester explained that, while in port and after the bilges have been pumped, the crew did not sound the bilges but instead simply reported the bilges as being empty, a common practice.  As a result, water entering the No. 2 hold was not detected until **after** the ship left port, when readings of .12 and .35 were made on October 18.  Captain Isbester testified that prudent practice would be to have the crew sound the bilges not only while at sea, but also while in port.  If such soundings were performed, it is likely the crew would have noticed the rising water levels in the No. 2 hold once the crack dropped below the water line.

Captain Isbester also testified the exceptionally high readings in the No. 2 hold on October 18 should have put the crew on notice of a potential problem.  The crew should have immediately pumped the bilges and then performed soundings at frequent intervals to monitor any changes.  Instead, the crew continued to perform daily soundings but did not pump the bilges.  The log book shows the bilges were not pumped until October 20, though Master Pedro Jamanila testified they were pumped on October 19 as well.  Captain Isbester found that when comparing the water levels in the bilges with the dates they were allegedly pumped, it is likely they were not pumped until October 20. At that point, the water levels were .56 and .54 meters for the port and starboard bilges respectively, levels which filled the bilges and resulted in seawater coming in contact with the steel coils.

Captain Isbester concluded that had the crew properly monitored the water levels in the bilge, both in port and at sea, and responded sooner to the high bilge readings by pumping the tank and investigating the source of the water, the water would not have reached the tank top and the steel coils would not have been damaged.

5

### DEFENDANT'S EXPERT - JAMES DOLAN

Dolan was a licensed engineer aboard several vessels for approximately five-and- a- half years.  Following his time at sea, he was employed by the American Bureau of Shipping (ABS) as a surveyor, eventually rising to the position of Senior Vice President of ABS.  During his time as a surveyor, he performed numerous classification surveys to assure compliance with classification rules, codes, and guides.  Dolan is currently managing partner of Martin, Ottaway, Van Hemmen & Dolan, which carries out condition surveys, vessel valuations, and investigations of vessel casualties for owners and insurers.

Dolan opines that water entered the No. 2 hold by three different means.  First, while the dock crew was loading the No. 2 hold in Szczecin, it began to rain.  Although it is documented the holds were all closed soon after the rain began to fall, if the No. 2 hold were open for a short time, some water could have entered the hold.

Second, while transporting and loading the coils, they were left uncovered and susceptible to the elements, including rainwater.  Rainwater that landed on the rolled coils seeped between the spiral seams within the coils.  After the coils were loaded, the water began to escape from the coils.  As the ship began its voyage, the rolling of the boat further increased the water's escape, resulting in the increasing bilge readings from October 18 to October 21.

Third, both cargo and hull sweat would result in water entering the No. 2 hold.  Cargo sweat is the result of cargo that is colder than the ambient temperature of the hold creating condensation on the cargo.  This condensation then drips off the cargo resulting in water entering the bilge.  Hull sweat is a similar occurrence resulting from ambient temperature in the hold that is warmer than the

6

seawater.  This results in condensation forming on the inside of the hull.  This condensation can also drip down the hull walls resulting in water entering the bilge.

Dolan also presents two different theories for how and when the crack formed on the starboard side of the No. 2 hold.  The first theory is vessel damage from rough seas when, from October 20 through October 24, the Inviken likely encountered rough weather, typical for the North Atlantic at that time of year.  The force of the waves on the ship's hull was sufficient to cause a fracture in the plating, which was already under stress from the heavy cargo load.

The second theory is that during this rough weather, debris, such as cargo containers or logs that fell from the decks of other ships, often floating in the North Atlantic, likely struck the side of the boat.  Such a collision could cause the hull to crack at the point of impact.

According to Dolan, these theories, together, explain how the crack in the hull formed and whether water entered the hold from the crack or elsewhere.  Dolan argues the crew's monitoring of the bilge readings on October 18 through October 20 was proper and their reaction to the hull breach on October 21 was timely.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

After evaluating the testimony and reports of these experts, the Court finds the crack on the starboard hull occurred sometime prior to October 18, most likely during the offloading of cargo at Antwerp.  The soundings clearly indicate excess water in both bilges of the No. 2 hold beginning with the first readings on October 18.  These readings continued to increase over the next three days reaching a maximum of .57 and .54 meters in the port and starboard bilges respectively.  This amount of water, nearly 600 gallons, could only be the result of a crack in the ship's hull.  Any rainwater that would have entered the hold during loading would be negligible and would not account for the

7

continuing water increase after the hold was sealed.[2]  Water seeping from the seams of the coils, even if water could actually enter those seams and remain (which this Court believes to be highly unlikely), would be of such a minimal amount that it would not create water levels like those found on October 18 through October 21.  Nor would cargo or hull sweat, addressed and discredited by Captain Isbester, create such high bilge readings.  Captain Isbester's testimony is both persuasive and credible, and the Court finds a crack that occurred prior to October 18, allowing seawater to enter the No. 2 hold, is the only plausible explanation for the elevated bilge soundings.

The Court also agrees with Captain Isbester that the crack occurred prior to the ship's departure from Szczecin.  Based on the height of the hull's crack and the depth of the dent surrounding the crack, collision with a barge is the most probable explanation.  Defendant's theory of a wave at sea causing the crack is not consistent with the depth or size of the dent surrounding the crack.  A wave would produce a large force against the hull and, if sufficient to cause a stress fracture, the wave would cause a large section of the hull to be indented, rather than the half-inch dent found here.

Furthermore, the weather records do not support high waves or a "peril of the sea" defense.  On the Beaufort Scale of 0 to 17, this ship's voyage was recorded at a number 8 which, by definition, does not constitute perilous waters. In addition, ship documents show the vessel was not slowed by adverse weather, further proof that peril of the sea is not applicable.

---

[2] Unlike cold-rolled steel, hot-rolled steel does not need to be covered from rainwater.  The evidence showed this steel was in fact covered during loading and also that the hatch was closed during loading.  The Court finds persuasive the report and pictures of the independent surveyor in this regard.  Photographs show little or no rainwater in the holds.  While rainwater might explain low water soundings, the high water soundings in the No. 2 hold was not rainfall.  Moreover, seawater caused the corrosion, not rainwater.

The defense theory about floating debris is also inconsistent with the surrounding facts. The location of the crack was below the water line on the hull. Floating debris, by definition, would be floating on the water's surface and could not cause a crack below the water line. Based on the crack's location, the depth of the indentation around the crack, and the offloading situation in Antwerp, a barge collision prior to the ship's arrival in Szczecin is the most likely cause of the crack.

Plaintiff presents two grounds for relief: (1) negligent operation and management; and (2) breach of bailment obligations. Each is discussed below.

**Negligent Operation and Management**

Fortis alleges the crew, employed by VSM, failed to exercise reasonable care when transporting the steel coils, specifically failing to discover the rising water in the bilges from October 18 through October 21, which resulted in damage to the coils. To maintain a claim for negligent operation and management under general maritime law, Plaintiff must prove: (1) duty to safely transport the product; (2) breach of that duty; (3) causation; and (4) damages. *See Hartley v. St. Paul Fire & Marine Ins. Co.*, 118 F. App'x 914, 919 (6th Cir. 2004). Here, the issues of causation and damage to the steel coils are not in dispute. Both parties agree seawater entering the hold caused the coils to rust. The remaining issues for the Court to decide are whether VSM owed any duty to safely carry the steel coils on the voyage and prevent seawater from entering the hold, and, if a duty existed, whether VSM breached this duty.

The parties disagree whether the crew owed any duty to the owner. VSM maintains the crew is only contracted to operate the ship and has a list of specified duties under its contract. Fortis argues VSM had a duty to properly monitor the water level in the bilges and properly investigate any abnormalities. The Court agrees with Fortis.

9

At the very least, the readings of .12 and .35 taken by the crew on October 18 should have led to serious concern for cargo damage.  These abnormal soundings should have generated an investigation.  Waiting to pump until October 20, more than forty-eight hours after high-water readings, was negligent.

VSM employed all of the crew aboard the Inviken.  No other individuals were aboard the ship during the voyage.  The crew was responsible for all operations aboard the ship, including the monitoring of water in the holds and bilges.  This duty is evidenced by the bilge soundings and log book entries.  These entries create a record of the crew's responsibility to sound the bilges to gauge any changes in water levels.  Implied in this record-keeping is the duty to take action when any abnormalities exist in the bilge soundings, including a thorough investigation to detect the source of leakage.

Based on the bilge soundings in the log book, the Court has found that seawater began entering the No. 2 hold prior to October 18.  The log book entries show that on October 19 and October 20 the crew inspected each of the holds and found nothing out of the ordinary.  However, the log book does not indicate what type of inspections were performed, i.e., whether they were visual inspections from the top of the hold or interior inspections with crew actually inside the hold.  Captain Isbester testified the crew must have only performed visual inspections because the crew would have clearly noticed the rising water if they had entered the hold.  Visual inspections of the No. 2 hold, in light of the high water readings, fall below a reasonable standard of care.  Captain Isbester also testified that rising bilge soundings, at the rate reported in the No. 2 hold, indicate a major problem requiring a thorough investigation to determine the source of the water.  The crew did not perform a thorough inspection

10

until October 21, when they in fact found the crack in the hull.[3]  The crew should have entered and inspected the hold on October 18 or, at the latest, October 19, when the water level in the No. 2 port and starboard bilges were .29 and .35 respectively, almost three times as much as any other hold.  The failure of the crew to properly and timely investigate the rising water levels was a breach of VSM's duty of reasonable care.

The seawater was a direct causal link to the damage to the steel coils.  Therefore, Fortis established each of the elements of negligence and VSM is liable.

**Breach of Bailment Obligations**

Fortis argues VSM is also liable as a bailee.  Bailment is defined as "[a] delivery of personal property by one person (the bailor) to another (the bailee) who holds the property for a certain purpose under an express or implied-in-fact contract."  BLACK'S LAW DICTIONARY (8th ed. 2004).  Under general admiralty law, bailment requires complete delivery to the bailee, and the bailee must have exclusive possession of the bailed property, even as against the property owner.  *Thyssen Steel Co. v. M/V KAVO YERAKAS*, 50 F.3d 1349, 1355 (5th Cir. 1995).  The Court agrees that VSM is a bailee and, as such, is liable.

Although VSM argues that because it is not the ship owner it is not the bailee, the Court finds that VSM did have exclusive control of the cargo with responsibilities of ship management.  This conclusion is further supported by the documentation.  Inviken Master Jamanila signed the bill of lading, through an agent, when the cargo was loaded.  This signature is sufficient to constitute a

---

[3] Although the log book entry for October 20 indicates the crew "carried out thorough inspection of cargo hold w/ steel coils," the Court finds it inconsistent that a thorough inspection was performed and yet no water was discovered when high-water bilge readings were recorded on that **same** day.  It is likely that either no inspection or only a visual inspection from the top of the hold was performed.

transfer of possession under a contract of carriage, thus making VSM vicariously liable as a bailee. *See Thyssen Steel*, 50 F.3d at 1352 ("A contract of carriage with the vessel owner may be either directly between the parties, or by virtue of the charterer's authority to bind the vessel owner by signing the bill of lading 'for the master'.").

As discussed above, the crew failed to use reasonable care in monitoring the water levels in the bilges and investigating the source of the water. When the steel coils were returned to the bailor, Metallia, they were damaged. Therefore, VSM is also liable under bailment law.

## CONCLUSION

The Court finds VSM liable to Fortis in the amount of $375,000, plus interest. *See Green v. SCNO Barge Lines*, No. 88-2948-G, 1992 WL 464732, at *8 (W.D. Tenn. Sept. 28, 1992) ("Although prejudgment interest in admiralty cases under the general maritime law is within the discretion of the trial court, it is generally awarded unless 'peculiar circumstances' are present.") (citations omitted.) Fortis is also awarded interest at eight percent (8%), the applicable rate for Ohio, beginning October 30, 2002, the date of arrival in Toledo. *See id.* at *9 (under general maritime law the court should look to the appropriate state law to determine the amount of prejudgment interest). However, the Court declines to award attorney fees, finding VSM's positions were not taken in bad faith. *See Shimman v. Int'l Union of Operating Eng'rs, Local 18*, 744 F.2d 1226, 1231 (6th Cir. 1984) ("The unsuccessful [good faith] litigant is not penalized even when an injured party whose claim is upheld is not made completely whole because of the cost of litigation.").

IT IS SO ORDERED.

___ s/ Jack Zouhary ____
JACK ZOUHARY
U. S. DISTRICT JUDGE

September 30, 2008

12